Jeanine Zalduendo (SBN 243374)
William Odom (SBN 313428)
**ZWEIBACK, FISET & ZALDUENDO, LLP**
315 W. 9th Street, Suite 1200
Los Angeles, CA 90014
Telephone: (213) 266-5170
Email: *jeanine.zalduendo@zfzlaw.com*
Email: *william.odom@zfzlaw.com*

Attorneys for Plaintiff
X Corp.

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| X CORP., a Nevada corporation, | Case No.   3:25-cv-10423 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1) **Trade Secret Misappropriation (18 U.S.C. § 1836)** |
| YAO YUE, an individual; IOP SYSTEMS, INC., a Delaware corporation; and DOES 1-10, inclusive, | 2) **Computer Data Access and Fraud (Cal. Pen. Code § 502)** |
| | 3) **Conversion** |
| Defendants. | 4) **Unjust Enrichment** |
| | 5) **Unlawful/Unfair/Fraudulent Business Practices (Cal. Bus. & Prof. Code § 17200,** *et seq.***)** |
| | **JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff X Corp. ("Plaintiff" or "X Corp.") (formerly "Twitter"), by and through its attorneys, based upon knowledge as to itself and its own actions and based on the independent investigation of counsel and information and belief as to all other matters, hereby alleges against Defendants Yao Yue ("Yue") and IOP Systems, Inc. ("IOP Systems") (collectively, "Defendants"), and John/Jane Does 1 through 10, as follows:

## NATURE OF THE CASE

1.    After being fired as the head of Twitter's Infrastructure Optimization and Performance ("IOP") Team, *Yue surreptitiously downloaded 6 million lines of Twitter's (now known as X Corp.'s) proprietary and confidential source code to external drives in order to launch and benefit her own aptly-named company, IOP Systems, built off of her former employer's intellectual property*.

2.    Among the exfiltrated code were highly specialized proprietary tools developed and perfected by X Corp. to optimize the performance of its complex social media platform ("X Corp.'s Trade Secrets").  This set of internal tools allows X Corp. to operate at scale with maximum efficiency and minimal resource expenditure—the very reason for X Corp.'s value and competitive success.

3.    Yue then launched IOP Systems just days after her willful and malicious exfiltration occurred, offering customers services using *these same specialized tools*.  IOP Systems markets "performance-specific monitoring and automated benchmarking tools to improve application runtime behavior so organizations can strike the most cost effective balance for maximum performance of cloud-hosted applications."  Not coincidentally, Yue's IOP Team at X Corp. had been responsible for developing performance-monitoring and benchmarking tools "to optimize system responsiveness and resource allocation."  Yue knew that these tools and services would be incredibly valuable to others, as they had been to X Corp., and indeed, IOP Systems's website brags that its founders "met while working for Twitter, where we saved the company over $100,000,000 over 5 years."

4.    Put plainly, Yue intentionally stole X Corp.'s Trade Secrets to benefit herself and IOP Systems.

5.    Yue's looting of X Corp. capitalized on the shift in ownership and management resulting from Elon Musk's acquisition of Twitter just weeks earlier.  It is evident that Yue had been

planning the launch of IOP Systems for some time, knew exactly the code she would need to take to do it, and saw this as her opportunity to strike. She assumed that with all of the changes to personnel, teams, and company structures at X Corp., no one would notice her massive exfiltration of source code.

6.     And given her careful planning and execution, no one did – until October 2024 when Yue's former supervisor revealed to X Corp. that Yue had bragged about how Yue and other former X Corp. colleagues exfiltrated X Corp. source code needed to start their own venture, IOP Systems. Yue's former supervisor also highlighted that Yue had made several strange post-termination requests through non-company channels to designate certain internal, proprietary data as "open-source." This prompted an in-depth, forensic investigation of Yue's user account activity, which revealed her mass-exfiltration of source code and culminated in this lawsuit. It is now clear that Yue stole X Corp.'s Trade Secrets to launch IOP Systems and spent the months following her exfiltration trying to convince former coworkers to "open source" X Corp.'s other valuable data.

7.     Yue's actions to harm X Corp. and benefit IOP Systems violated numerous California and federal statutes, including but not limited to 18 U.S.C. § 1836 (misappropriation of trade secrets), California Penal Code § 502 (Computer Data Access and Fraud Act), and California Business & Professions Code § 17200, et seq. (Unlawful Business Practices), as well as common-law prohibitions against conversion and unjust enrichment.

8.     As such, Defendants are liable to X Corp. for all damage X Corp. has sustained, as well as for all profits Defendants gained, as a direct and proximate result of Defendants' violations. X Corp. is further entitled to injunctive relief, treble/exemplary damages, and attorneys' fees and court costs, among other types of relief.

**PARTIES**

9.     Plaintiff X Corp. is a Nevada corporation, authorized to conduct business in California, with its principal place of business located at 865 FM 1209, Building 2, Bastrop, Texas 78602.

10.     Defendant Yao Yue is a former employee of X Corp., and was based in the San Francisco office. On information and belief, Yue is currently a resident of San Francisco County, California.

11. On information and belief, Defendant IOP Systems, Inc. is a Delaware corporation with headquarters in San Francisco, California, located at 282 2nd Street, Suite 302, San Francisco, CA 94105.

12. The true names and capacities of the Defendants John/Jane Does 1 through 10 are unknown to Plaintiff at this time. After filing this Complaint, Plaintiff will seek leave of court to conduct expedited discovery in order to establish each of these Defendants' identities and related jurisdictional facts. Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of individuals who engaged in the illegal conduct.

13. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each Defendant herein was the agent of the other, and each was acting within the course and scope of that agency and with the permission, consent and knowledge of the other.

## JURISDICTION AND VENUE

14. This Court has federal-question subject-matter jurisdiction over the claims asserted in this Complaint arising under federal law under 28 U.S.C. § 1331. This Court has diversity subject-matter jurisdiction over the claims asserted in this Complaint arising under state law under 28 U.S.C. § 1332. This Court also has supplemental subject-matter jurisdiction pursuant to 28 U.S.C. § 1367 over the claims asserted in this Complaint arising under state law because they form part of the same case or controversy.

15. This Court has personal jurisdiction over Yue because Yue resides in this judicial district, and otherwise has extensive contacts with the State of California and this judicial district specifically, including contacts arising out of the particular transactions that are the subject of Plaintiff's claims. On information and belief, Yue is a resident of San Francisco County, California, and Yue conducts business in the State of California through IOP Systems and otherwise. Yue's trespassing on X Corp.'s premises and exfiltrating X Corp. property—the primary conduct on which X Corp.'s claims are based—occurred in San Francisco, California. Therefore, this Court's exercise

of *in personam* jurisdiction over Yue comports with traditional notions of fair play and substantial justice.

16.    This Court has personal jurisdiction over IOP Systems because IOP Systems is headquartered in this judicial district, and IOP Systems otherwise has extensive contacts with the State of California and this judicial district specifically, including contacts arising out of the particular transactions that are the subject of Plaintiff's claims.  IOP Systems conducts substantial business in California, including substantial business in the San Francisco area.  IOP Systems was founded using source code and data stolen from X Corp. by Yue, which occurred in San Francisco, California.  Therefore, this Court's exercise of *in personam* jurisdiction over IOP Systems comports with traditional notions of fair play and substantial justice.

17.    Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this judicial district, as well as under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is also proper under 28 U.S.C. § 1391(b)(3) because at least one Defendant is subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

### I.    X Corp.'s Business.

18.    X Corp., formerly "Twitter," was founded in or around March 2006, and launched a social media platform in July 2006.  Twitter began as a microblogging platform for sharing short status updates.  Twitter grew rapidly, becoming a major tool for breaking news stories and other information sharing.  Elon Musk acquired and became the Chief Executive Officer of Twitter, which was then renamed to X Corp., in October 2022 (the "Musk Acquisition").

19.    X Corp.'s business operates in an electronic, computer-based environment.  The X Corp. social media platform exists as the result of millions of lines of code, software protocols, and business decisions, all of which are combined, built upon, and synthesized to maintain the user-facing end product.

20.    Over the years, X Corp. has expended substantial resources researching and developing its technologies, trade secrets, technical strategies, and business plans related to its social

media platform and related services.  X Corp. has done so through the expenditure of considerable employee work hours and company resources.  These efforts have led to numerous innovative features of X Corp.'s platform, which give X Corp. a competitive edge in the crowded social-media marketplace.  For example, X Corp. has developed software tools that (1) allow for more efficient analysis of user data captured by X Corp.'s platform, which in turn allows for user experience optimization; (2) automate certain maintenance tasks to reduce the amount of manpower and/or time needed to complete such tasks; and (3) allow for earlier and more reliable detection of potential threats to the system—just to name a few examples.

21.    As X Corp.'s engineers and software developers continue to improve the platform, old code, software protocols, or ways of accomplishing a task become outdated and inefficient.  At all times relevant to this action, X Corp. employed a team called the Infrastructure Optimization ("IOP") Team, which worked on complex technical issues to improve performance and efficiency for the platform.  Put another way, the IOP Team was empowered to detect outdated systems and operational inefficiencies within X Corp.'s infrastructure and develop solutions to save X Corp. time and money.

22.    In order to perform this task, the IOP Team developed a set of tools for collecting, storing, and analyzing system performance measurements at each level of X Corp.'s systems, including measurements related to application performance, network speed, computer resource usage, and overall system health.  The tools also included dashboards for viewing system performance and for analysis of system slowdowns and failures, and tools for estimating system performance under hypothetical operating conditions.  The developed tools were valuable to X Corp. both in reducing operating costs and in improving system performance.  These analyses also allowed other teams within X Corp. to gain valuable insights into the performance of their systems, enabling them to maximize their efficiency.

## II.    Yue's Employment with X Corp.

23.    X Corp. hired Yue on November 1, 2010, as a software engineer in its San Francisco, California location.  She was promoted in 2011 to a Software Engineer II.  Over time, Yue was promoted to Staff Software Engineer, Senior Staff Software Engineer, and lastly, in 2017, as the Principal Software Engineer in the Redbird section of the IOP Team.

24.     Prior to October 2022, X Corp.'s engineering department had three areas: Goldbird, which was responsible for monetization and advertising; Bluebird, which was responsible for the product; and Redbird, which was responsible for the infrastructure system.  Within Redbird were several large organizations, including Platforms, which was responsible for all internal software systems such as storage, computing, scheduling and messaging.  Yue's particular team within Redbird determined the amount of cell phone and data center capacity and cloud capacity X Corp. needed as well as optimizing its cloud usage. Yue reported to Sandy Strong, who was Director of Performance Engineering, since June of 2022.

25.     Yue, as the Principal Software Engineer of Redbird, oversaw several software engineers and one site reliability engineer including Brian Martin, Rebecca Isaacs, Xi Yang, Sean Lynch, and Mihir Nanavati.  Yue's team developed benchmarking tests and analyses for metrics like latency and throughput to optimize system responsiveness and resource allocation.

26.     As described more fully below, Yue used her position, and the trust and autonomy that came with it, to pilfer X Corp.'s valuable, proprietary source code and confidential data in order to develop and benefit her own personal business venture.

**III.    Yue's Termination from X Corp.**

27.     Shortly after the Musk Acquisition, on November 10, 2022, X Corp. changed its remote work policy and required employees to return to the office.

28.     Following the announcement of this policy change, Yue tweeted to Zoe Schiffer, a journalist with over 100,000 followers who was covering X Corp. changes at that time, encouraging X Corp. employees not to resign in light of the new policy, but rather, force X Corp. to "fire you." Yue tweeted at Ms. Schiffer in order to maximize visibility of her post.

COMPLAINT



29.     At the time of her tweet, Yue had approximately 5,000 followers, and approximately 20% of her followers (or 1,000 people) were current or former X Corp. employees.  970 people "liked" Yue's tweet, ninety-seven people "re-tweeted" her tweet (giving her post further visibility and reach), nineteen people commented on the tweet, and nineteen people saved the tweet.

30.     X Corp. policy requires that X Corp. managers conform to high professional standards, including among other things, to be ambassadors of X Corp.'s values and model them in X Corp. managers' everyday work lives, setting a strong ethical tone and building a culture of integrity with managers' teams.  Yue's actions calling for employee insubordination undoubtedly fell short of this standard.  Accordingly, X Corp. terminated Yue's employment on Tuesday, November 15, 2022.

31.     On information and belief, Yue orchestrated such a public exit from X Corp. in order to create a name for herself, obtain connections to the press, and ultimately stir up publicity for her new venture, IOP Systems, which launched just weeks later.

## IV.    Yue Attempts to Have X Corp. "Open Source" Data After Her Termination.

32.     On or around October 18, 2024, X Corp. interviewed Yue's former supervisor, Ms. Strong, pertaining to an unrelated legal matter involving Yue.  During this interview, Ms. Strong revealed to X Corp. that, subsequent to Yue's termination, Yue had been making repeated requests to

open-source certain X Corp. data, as well as made comments that she had exfiltrated X Corp. source code to benefit her new company.

33.    According to Ms. Strong, shortly after Yue's termination, Yue began contacting Ms. Strong, asking her to push through a project that had been underway at the time of the Musk Acquisition.  The aim of the project was to open-source certain data logs, with the purported goal of educating the broader technology community as to the performance of systems in a company of X Corp.'s scale.

34.    Prior to the Musk Acquisition, the project was going through the normal process for approval.  Yue wanted Ms. Strong to "nudge" the project along, claiming that it was simply waiting for someone to sign off on the open-source designation.

35.    On Sunday, December 18, 2022, Yue was invited to a dinner party at Ms. Strong's house.  While there, Yue again asked Ms. Strong to push the open-source approvals along, and bragged about how she and other former X Corp. colleagues had exfiltrated X Corp. source code needed to start their own venture, IOP Systems.

36.    On December 20, 2022, Yue messaged Ms. Strong, asking her to report back "what Shannon says."  Ms. Strong was unsure who "Shannon" was, but assumed based on their prior dinner party conversation that "Shannon" must be the X Corp. employee who had been handling approvals regarding the prior open-source requests.  Ms. Strong felt that these continuing inquiries from Yue were inappropriate and made her feel uncomfortable.  Ms. Strong did not take any actions to respond to or otherwise push through Yue's open-source objectives.  However, she believes that Yue was contacting others at X Corp. to facilitate these requests as well.

37.    Months later, in June 2023, Yue again reached out to Ms. Strong to push the open-source project.  Ms. Strong continued to ignore these requests.

**V.    X Corp.'s Investigation of Yue Reveals Her Theft of X Corp.'s Trade Secrets.**

38.    Upon learning of Ms. Strong's revelations in October 2024, X Corp. began an investigation into Yue's post-termination activity.

39.    X Corp.'s investigation team eventually identified Yue as the unidentified source for the article, "Extremely Hardcore," by media outlet The Verge.  The article, published January 17,

2023 by Zoe Schiffer,[1] Casey Newton, and Alex Heath, featured information regarding X Corp.'s company-wide layoffs, workplace culture, confidential strategy meeting details, and detail regarding internal communications.

40.    X Corp. believes that Yue is quoted throughout the article, and that Yue provided the supposed details on company meetings, potential business strategy and future design features that Mr. Musk purportedly wanted to see on the platform, etc.   Although given the alias "Alicia" for confidentiality, the gender, occupation, tenure, employment actions, and termination date all matched that of Yue.

41.    Most alarming is that, according to the article, ***after her termination***, Yue used the service elevator to sneak into X Corp.'s San Francisco, CA office and purportedly gather personal belongings.  X Corp. is now concerned that Yue may have used this trespass to assist in her exfiltration of source code, circumventing X Corp.'s security measures.

42.    Indeed, X Corp.'s investigation reveals that on December 4, 2022 (perhaps during her time trespassing in X Corp.'s offices), Yue proceeded to willfully and maliciously exfiltrate to a USB drive 6 million lines of X Corp.'s proprietary and confidential source code from her company-issued laptop.  Yue had no legitimate reason to copy X Corp.'s source code at that time and lacked any authorization to do so.

43.    The 6 million lines of source code that Yue illegally accessed and exfiltrated contained X Corp.'s Trade Secrets.  X Corp.'s Trade Secrets include, without limitation, a set of highly specialized tools used for service efficiency profiling and monitoring performance designed by, and proprietary to, X Corp.  Among these tools are a continuous host-level profiling daemon that gathers profiling samples at a low frequency and exports them to enable data analysis; a set of scripts that facilitates the capacity planning, aurora job creation, and monitoring of cache backends as well as cluster management; a module to convert metric data into a more easily query-able and longer lasting format; a suite of scripts that are used for internal testing, benchmarking, experimenting, and collecting of data; and configuration files to setup dashboards for monitoring various metrics. X

---

[1] Ms. Schiffer is the same journalist at whom Yue tweeted her post regarding employee resignation on November 10, 2022.

Corp.'s Trade Secrets were specifically tailored for supporting X Corp.'s infrastructure efficiency and were designed for internal use only at X Corp.

44.    X Corp.'s current understanding of Yue's exfiltration may be just the tip of the iceberg. In the days leading up to her departure from X Corp., Yue performed multiple Google searches for ways to delete messages from her laptop as well as for ways to transfer large amounts of information from her laptop.  She also connected three different USB drives to her laptop on multiple occasions between November 15, 2022 and December 4, 2022,[2] for a total of over one hour and forty minutes. Although the operating system on Yue's laptop does not maintain an index of all of the ways that Yue could have exfiltrated data from her machine (including some of the methods she Googled), it is evident that Yue had time and opportunity to copy up to several times as much data and code as X Corp. was able to confirm from its analysis of her laptop.  This is very concerning, since Yue's position gave her broad access to X Corp. confidential projects and source code repositories. For example, at the time of her departure, her laptop contained copies of almost 1,000 source code repositories including a large number of X Corp.'s proprietary and confidential repositories.

45.    Later, X Corp. also learned that Yue, on behalf of IOP Systems, was a co-author of the research paper, "LatenSeer: Causal Modeling of End-to-End Latency Distributions by Harnessing Distributed Tracing" published at: https://jasony.me/publication/socc23-latenseer.pdf in or around October 30, 2023.  The paper introduces a tool, "LatenSeer," that can accurately predict end-to-end latency of a complex internet platform (such as X Corp.'s) based on trace data.  End-to-end latency estimation in web applications is crucial for system operators to foresee the effects of potential changes, helping ensure system stability, optimize cost, and improve user experience.

46.    The paper describes the analysis of Twitter trace data to derive "some design choices and optimizations that make LatenSeer practical, especially from our experiences when dealing with massive trace data at Twitter."  These traces were confidential and proprietary to X Corp. because they showed significant information about how X Corp.'s systems were configured at the time the traces were recorded, such as network topology, system resource configuration and usage, and system

---

[2] It appears that X Corp.'s Trade Secrets were only among the data and source code exfiltrated on December 4, 2022.

10

COMPLAINT

load balancing and performance under stress.  X Corp. kept these traces confidential because they reveal specifics regarding X Corp.'s system configuration.  Keeping its system configuration secret is an important part of how X Corp. enhances security and deters malicious actors.

47.    The paper notes at footnote 5 on page 10, that "LatenSeer is open-sourced at: https://github.com/yazhuo/LatenSeer, and the Twitter traces will be released upon legal approval." However, contrary to the statement in footnote 5, the traces were never properly authorized for release by X Corp.  Thus, Yue used confidential and proprietary X Corp. data for the publication of this paper that was not yet open source and that she was not authorized to use or publish.

48.    On information and belief, Yue took without authorization and still maintains a copy of the "Twitter traces" described in the paper and continues to use them through and to the benefit of IOP Systems.

## VI.    X Corp.'s Investigation Reveals Other IOP Systems Executives' Wrongdoing.

49.    The investigation of Yue also caused X Corp. to investigate some of Yue's team members who helped form IOP Systems, including Brian Martin.  Although the forensic information available is limited, it revealed that Martin coordinated with Yue, after his resignation, to change one of X Corp.'s GitHub source code repositories.

50.    Martin resigned from X Corp. on or about December 7, 2022, while he was on a pre-existing leave of absence.  Accordingly, Martin was not authorized to access any of X Corp.'s networks, sources, or services after his resignation.

51.    Martin, while employed at X Corp., was X Corp.'s sole maintainer of X Corp.'s Pelikan source code project on X Corp.'s GitHub account. Only people with specific authorization as a "maintainer," can make changes to a GitHub repository.

52.    In December 2022, *after he resigned from X Corp.*, Martin accessed X Corp.'s Pelikan project on GitHub without permission and misused his prior authorization as maintainer of the project to approve a requested change to the project code from another GitHub user.  This change altered the public description of the project and redirected GitHub users and developers of the project to a copy under another account, pelikan-io.  X Corp.'s investigation has revealed that the request to

modify Pelikan's description had been submitted by Yue under her GitHub alias "thinkingfish."  The investigation further revealed that the pelikan-io account is operated by Yue and Martin.

53.    Martin's actions gave the impression that X Corp. had authorized this change and endorsed the new project, when in fact it had not.  Martin, under Yue's direction, attempted to hijack X Corp.'s widely followed Pelikan project to the detriment of its ongoing development.

54.    Curiously, on January 18, 2023, Martin accessed and used the Erase Assistant application on his company laptop that he had not yet returned to X Corp.  The Erase Assistant is an app that comes preinstalled on certain Apple MacBook laptops like Martin's.  It is used to reset the device back to its factory settings, completely clearing the device and removing all user data.

55.    Unsurprisingly, the forensic reports of the activity on Martin's laptop that X Corp. commissioned during its investigation came back suspiciously clean, as if all system logs with details of Martin's activity had been intentionally sanitized.

56.    On information and belief, Martin erased—and thereby spoliated—evidence on his company laptop that would have implicated him in Yue's scheme to steal proprietary software and data, or otherwise would have incriminated him.

**VII.    IOP Systems Uses X Corp.'s Trade Secrets.**

57.    On information and belief, IOP Systems was founded by Yue, Martin, and other former X Corp. employees in November 2022.  IOP Systems's website confirms that the founders "met while working for Twitter."  IOP Systems was formally incorporated in the State of Delaware on December 20, 2022.

58.    According to IOP Systems's publicly available statements, it maintains a collection of proprietary and open-source software tools related to performance monitoring, benchmarking, and designing high-performance software.  Specifically, IOP Systems markets "performance-specific monitoring and automated benchmarking tools to improve application runtime behavior so organizations can strike the most cost effective balance for maximum performance of cloud-hosted applications."  IOP Systems does so by providing its customers "software to help you understand how your software utilizes hardware resources, find optimization opportunities, and make sure your changes perform the way you expect them to."

59.    Not coincidentally, Yue's IOP Team at X Corp. had been responsible for developing performance-monitoring and benchmarking tools "to optimize system responsiveness and resource allocation."   At the time Yue departed from X Corp., her team was working on projects to expand X Corp.'s capabilities in areas related to system performance metrics, observation, monitoring, and analytics.  X Corp.'s Trade Secrets that Yue willfully and maliciously exfiltrated included her team's in-progress work on proprietary X Corp. tools critical to these projects.  As such, X Corp.'s Trade Secrets would have been unavailable to, and extremely valuable to, anyone planning to do business in the systems engineering space.

60.    On information and belief, IOP Systems uses X Corp.'s valuable Trade Secrets for a competitive advantage in this space, shortcutting the need to spend the millions of dollars on development and years of engineering effort that X Corp. had expended.

61.    Moreover, Yue knew that the tools comprising X Corp.'s Trade Secrets, and the services they would allow IOP Systems to provide, would be incredibly valuable to others, as they had been to X Corp.  Indeed, Yue has publicly confirmed that "[o]ver the course of five years, [her] team (many of whom are now founding members of IOP Systems) saved Twitter over $100 million dollars," making clear that the X Corp. Trade Secrets she stole and made available to IOP Systems, are highly valuable.

**VIII.   X Corp. Goes to Great Lengths to Protect Its Trade Secrets.**

62.    To access X Corp.'s network, an employee first must be pre-approved and granted access by X Corp.  X Corp. uses multi-layered network security in order to protect its valuable source code.  X Corp.'s source code is stored in both internal and external repositories, with their open-source source code residing on GitHub. The X Corp. internal repositories can only be accessed by X Corp. employees who have both (i) a username and password that grants access to the servers, and (ii) a file called a "token" that is unique to the employee username and necessary to decrypt information received from X Corp.'s code repository. Even then, X Corp.'s code repository cannot be accessed using normal internet or network connections; instead, a user must connect from one of X Corp.'s "whitelisted" network locations. Attempts to connect from all other locations will be rejected.  Thus, when employees work remotely, they must first connect to X Corp.'s offices through

a virtual private network ("VPN") using a username, password and multi-factor authentication ("MFA") device that is unique to each employee.  Moreover, all of these security layers operate in tandem, so an intruder cannot access the code without somehow obtaining (i) VPN credentials, (ii) credentials to log into the code repository, and (iii) a copy of the token file that matches those credentials--simply stealing a single password would not work.

63.    Moreover, access to X Corp. proprietary repositories is granted only to individual employees or teams within the company on a need-to-know basis. The filesystems of all X Corp. laptops are fully encrypted, ensuring that the information stored on the machines is inaccessible without proper authentication.

64.    In the course and scope of her duties as a Principal Software Engineer of Redbird, Yue was provided with, and had access to confidential and proprietary X Corp. information, including, but not limited to, X Corp.'s most important and fundamental source code; *i.e.*, source code which enables the entire platform to run efficiently.

65.    At no time did Yue request nor receive any waiver of or exception to her obligations of confidentiality to X Corp.  Additionally, Yue never requested, and X Corp. never gave her, any consent, permission, approval or authorization to take, retain, or use any confidential and proprietary information for any purpose other than the limited purpose for which it was made available to her in the performance of her duties to X Corp. during her employment.  Moreover, any consent, permission, approval or authorization Yue ever had to access to confidential and proprietary X Corp. information during the course of her employment, ended immediately upon her termination.

### FIRST CAUSE OF ACTION

### (Trade Secret Misappropriation – YUE and IOP SYSTEMS)

66.    X Corp. realleges the allegations in the foregoing paragraphs as if set forth fully herein.

67.    Yue's and IOP Systems' actions as described above constitute violations of one or more provisions of the federal Defend Trade Secrets Act, 18 U.S.C. § 1826, *et seq.* ("DTSA").

68.    The DTSA allows an "owner of a trade secret that is misappropriated" to "bring a civil action [if] the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

69.     The DTSA defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" that "(A) the owner thereof has taken reasonable measures to keep ... secret; and (B) ... derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

70.     The DTSA defines misappropriation to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret of another without express or implied consent by a person" who "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "Improper means" include theft, misrepresentation, and breach of a duty to maintain secrecy. 18 U.S.C. § 1839(6).

71.     The DTSA permits the Court to grant an injunction "to prevent any actual or threatened misappropriation" of the plaintiff's trade secrets, among other remedies. 18 U.S.C. § 1836(b)(3).

72.     X Corp. has dedicated and continues to dedicate substantial time and resources towards developing the X Corp. Trade Secrets, as detailed above.

73.     At all relevant times, X Corp. has made reasonable efforts to ensure that the X Corp. Trade Secrets remain confidential, proprietary, secret, and available for X Corp.'s commercial use only, as detailed above.

74.     Through her role as Principal Software Engineer in the Redbird section of X Corp.'s IOP Team, Yue had access to X Corp.'s Trade Secrets, including on her company-provided laptop.

75.     However, subsequent to her termination on November 15, 2022, Yue no longer had authorization to access any of X Corp.'s servers, networks, data, or information, including X Corp.'s Trade Secrets.   Nonetheless, on December 4, 2022, Yue, without X Corp.'s knowledge or consent, exfiltrated 6 million lines of X Corp.'s source code, including X Corp.'s Trade Secrets to external drives.

76.     Yue had no legitimate reason to copy X Corp.'s Trade Secrets at that time.   On information and belief, Yue then provided X Corp.'s Trade Secrets to her new company, IOP Systems,

and IOP Systems started, and continues to this day, to use X Corp.'s Trade Secrets commercially to increase IOP Systems's profit and competitiveness.

77.    Yue's conduct amounted to misappropriation because Yue acquired X Corp.'s Trade Secrets by improper means: theft.  Furthermore, as a result of her position and years working for X Corp., Yue knew that the Trade Secrets she stole were proprietary to X Corp. and valuable to X Corp. by virtue of remaining secret.  IOP Systems's conduct also amounted to misappropriation because Yue's knowledge is imputed onto IOP Systems, and IOP Systems therefore knew that the Trade Secrets it deployed in its business belonged to X Corp. and were improperly acquired by Yue.

78.    X Corp. continues to investigate the full extent of Yue's misappropriation.

79.    X Corp.'s Trade Secrets that Yue willfully and maliciously exfiltrated include, without limitation, a set of highly specialized tools used for service efficiency profiling and monitoring performance of X Corp.'s social media platform, which operates in interstate commerce and internationally.

80.    X Corp.'s Trade Secrets that Yue willfully and maliciously exfiltrated and provided to IOP Systems are the result of the culmination of millions of dollars of investment and multiple years of development by X Corp.  X Corp.'s Trade Secrets could save IOP Systems and its clients hundreds of millions of dollars in research and development and years of engineering effort.

81.    X Corp.'s Trade Secrets derive significant economic value from not being generally known to the public or to others who can obtain economic value from their disclosure or use.

82.    X Corp. did not consent to the taking, disclosure, or use of any of X Corp.'s Trade Secrets by Yue, IOP Systems, or by anyone other than authorized employees or business partners using them solely for X Corp.'s business purposes.

83.    Yue knew or should have known that the X Corp. Trade Secrets she misappropriated were proprietary and confidential.  Nevertheless, Yue improperly acquired, used, and/or disclosed X Corp.'s Trade Secrets.  In doing so, Yue's actions constitute misappropriation under the DTSA.

84.    IOP Systems knew that the information that Yue provided to it consisted of X Corp.'s illegally obtained Trade Secrets.  Nevertheless, IOP Systems used, and/or disclosed X Corp.'s Trade

Secrets in its business operations.  In doing so, IOP Systems' actions constitute misappropriation under the DTSA.

85.     Each of Yue's and IOP Systems' acts of misappropriation was done willfully and maliciously.  X Corp. is therefore entitled to exemplary damages in a sum equal to twice the amount of the award of damages according to proof at trial, and attorneys' fees pursuant to 18 U.S.C.§ 1836(b)(3)(C)-(D).

86.     As a direct and proximate result of Yue's and IOP Systems' use and/or disclosure of X Corp.'s Trade Secrets, X Corp. has suffered and continues to suffer harm, including loss of confidential and proprietary information, competitive position, and good will, the amount of which will be difficult to ascertain.  X Corp. will continue to be irreparably harmed unless Yue and IOP Systems are enjoined from further use and disclosure of X Corp.'s Trade Secrets.  X Corp. is further entitled to reasonable attorneys' fees under the DTSA.

87.     X Corp. also requests that the Court take affirmative acts to protect X Corp.'s Trade Secrets, as set forth in 18 U.S.C. § 1836(b)(3)(A). including by ordering the inspection of IOP Systems's computers, drives, e-mail accounts, cloud storage accounts and other sources and equipment by a forensics expert to determine whether X Corp. trade secrets were wrongfully taken and/or disseminated to others, and to ensure that no X Corp. trade secrets remain saved on those systems; and issue a writ of possession, a preliminary injunction, and a permanent injunction ordering the return of X Corp.'s trade secret information and prohibiting IOP Systems from continuing its unlawful actions.

## SECOND CAUSE OF ACTION

### (Violation of Cal. Pen. Code § 502 - YUE)

88.     X Corp. realleges the allegations in the foregoing paragraphs as if set forth fully herein.

89.     X Corp. is entitled to maintain a private right of action against Yue pursuant to California Penal Code Section 502(e)(1).

90.     Yue has violated Cal. Pen. Code § 502(c)(2) by knowingly, willfully and without permission taking, copying, and making use of data from a computer, computer system, or computer

network, and taking and/or copying any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

91.    As described above, Yue accessed X Corp.'s source code repositories via an X Corp.-owned device to knowingly, improperly, and without permission save to her personal devices X Corp. Trade Secrets, and other confidential and proprietary data, traces, and source code.

92.    Yue was not authorized and had no business reason to access and personally retain the X Corp.'s Trade Secrets and other confidential and proprietary data, traces, and source code after her termination.  In light of her termination, Yue's access to this confidential and proprietary information was not committed within the scope of her lawful employment at X Corp., and was not reasonably necessary to the performance of her work assignments at X Corp.

93.    The value of X Corp.'s supplies and computer services with which Yue interfered exceeds $250.

94.    As a direct and proximate result of Yue's unlawful conduct within the meaning of Cal. Pen. Code § 502, Yue has caused damage to X Corp. in an amount to be proven at trial.  X Corp. is also entitled to recover its reasonable attorneys' fees pursuant to Cal. Pen. Code § 502(e)(2).

95.    X Corp. is informed and believes that the aforementioned acts were willful and malicious in that Yue's acts described above were done with the deliberate intent to injure X Corp.'s business.  X Corp. is therefore entitled to punitive damages under Cal. Pen. Code § 502(e)(4).

96.    Until and unless enjoined by this Court, Yue's wrongful conduct will cause irreparable injury to X Corp. because X Corp. derives significant economic value from X Corp.'s Trade Secrets remaining confidential, and X Corp. is being damaged by Yue's access, taking, and use of X Corp. Trade Secrets.  X Corp. has no adequate remedy at law for the injuries that it is currently suffering or that it could suffer in the future if Yue continues to violate California Penal Code Section 502(c).

## THIRD CAUSE OF ACTION

### (Conversion – YUE and IOP SYSTEMS)

97.    X Corp. realleges the allegations in the foregoing paragraphs as if set forth fully herein.

98.    The operation of X Corp.'s platform creates certain confidential data and traces that provide information on how X Corp.'s systems are configured and operating at the time the traces are

18

recorded. Though these data and traces do not necessarily derive independent value by virtue of being secret, keeping this information confidential is nonetheless an important part of how X Corp. enhances security and deters malicious actors, who could misuse the traces and the information contained therein to harm X Corp.

99.    At all times relevant here, X Corp. was the rightful owner and entitled to possession of its confidential data and traces.

100.    Nonetheless, Yue and IOP Systems knowingly and intentionally interfered with X Corp.'s dominion, possession, use, and ownership of its confidential data and traces by causing them to be transferred to their possession. Yue and IOP Systems then used the data and traces in service of the publication, "LatenSeer: Causal Modeling of End-to-End Latency Distributions by Harnessing Distributed Tracing" on or about October 30, 2023. These actions substantially interfered with X Corp.'s right to exert dominion over its confidential data and traces.

101.    X Corp. never gave Yue nor IOP Systems permission to take, transfer, or possess any of its confidential data or traces, nor to publish them in any way.

102.    As of the date this Complaint was filed, Yue and IOP Systems have not confirmed whether any X Corp.'s confidential data or traces remain in its possession.

103.    Yue and IOP Systems knew or had reason to know that X Corp. was lawfully entitled to possession of its confidential data or traces, but intentionally took possession of them to damage X Corp. and/or with a conscious disregard for X Corp.'s lawful right to ownership and possession of its confidential data or traces.

104.    Yue's and IOP Systems's knowing or intentional taking and retention of X Corp.'s confidential data or traces was a substantial factor in causing X Corp.'s harm, and is a substantial factor in causing the harm X Corp. continues to suffer.

105.    Yue's and IOP Systems's above-described wrongful acts were intentional, malicious, oppressive, or fraudulent. Yue and IOP Systems carried on their above-described wrongful acts with a willful and conscious disregard of X Corp.'s rights, such that X Corp. is entitled to recover punitive damages against Yue and IOP Systems, in an amount that is sufficient and appropriate to punish them as well as to deter them from committing similar acts in the future.

1

2

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment – IOP SYSTEMS)**

3       106.    X Corp. realleges the allegations in the foregoing paragraphs as if set forth fully herein.

4       107.    As set forth above, Yue and IOP Systems have converted X Corp.'s confidential data

5   and traces.  This information provides X Corp., and anyone who possesses it, critical detail on how

6   X Corp.'s systems are configured and operating at the time the traces are recorded.  This data set,

7   while not commercially exploitable in itself, is nonetheless beneficial to an entity like IOP Systems

8   informing its design choices and optimizations of its system performance and efficiency tools and

9   software.

10      108.    By its wrongful acts and omissions, IOP Systems has been unjustly enriched at the

11  expense of and to the detriment of X Corp.  Specifically, as set forth above, IOP Systems is knowingly

12  benefitting from improper use of X Corp.'s confidential data and traces, which IOP Systems knows

13  to have been acquired improperly by Yue.

14      109.    As a direct and proximate result of the foregoing conduct, X Corp. has been damaged

15  and is entitled to full disgorgement of all profits, including those in any way related to IOP Systems's

16  retention, use, or disclosure of X Corp.'s confidential data and traces.

17

**FIFTH CAUSE OF ACTION**

18

**(Unlawful/Unfair/Fraudulent Business Practices – YUE and IOP SYSTEMS)**

19      110.    X Corp. realleges the allegations in the foregoing paragraphs as if set forth fully herein.

20      111.    The conduct of Yue and IOP Systems as alleged herein constitutes "business act[s] or

21  practice[s]" within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*  Specifically, Yue's taking

22  of X Corp.'s confidential data and traces and disclosure of them to IOP Systems, informed IOP

23  Systems' design choices and optimizations of its system performance and efficiency tools and

24  software.

25      112.    Defendants' business practices were unlawful because, as alleged above, they violated

26  various California and federal laws, including laws against unauthorized computer access,

27  conversion, and unjust enrichment.

28

113.    Defendants' business practices were unfair because, as alleged above, the unjust benefit Defendants conferred on themselves is not outweighed by any social utility to their conduct.

114.    Defendants' business practices were fraudulent because, as alleged above, they were reasonably calculated to deceive or mislead X Corp. or other members of the public, including but not limited to by conspiring with Martin to deceptively change the description of X Corp.'s Pelikan project on GitHub.

115.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, X Corp. has been damaged and is entitled to full disgorgement of all profits, including those in any way related to Defendants' retention, use, or disclosure of X Corp.'s confidential data and traces, obtained by Defendants as a result of their unlawful, unfair, and fraudulent acts as alleged herein.

## **ENTITLEMENT TO JUDGMENT AND PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff X Corp. respectfully prays for judgment against Defendants, as follows:

a)    For preliminary and permanent injunctive relief requiring Yue, IOP Systems, and all persons or entities acting in concert or participation with them, to:

    i.    refrain from obtaining, reviewing, using, or transmitting, or disclosing any of X Corp.'s Trade Secrets and other confidential and proprietary data, traces, and source code;

    ii.    provide a list of all materials Yue removed from X Corp., including all dates that such items were taken (the "Inventory");

    iii.    provide a list of all individuals to whom Yue or IOP Systems have disclosed each item on the Inventory, including the date of transmission;

    iv.    provide a written statement identifying all personal locations, personal devices, personal accounts, or personal storage media–whether physical or electronic–where any X Corp. Trade Secrets and other confidential and proprietary data, traces, and source code belonging to X Corp. are or have been stored, maintained, or accessed; and

21

1        v.      deliver to X Corp. each item on the Inventory, including any copies and/or summaries thereof, still in Yue's or IOP Systems's possession, custody, or control.

b)    That X Corp. recovers from Yue and IOP Systems, jointly and severally, an amount equal to the damages it has incurred as a result of Yue's actions, including punitive damages for her intentional actions, to be determined at trial.

c)    For disgorgement of Defendants' wrongfully acquired profits.

d)    For recovery of attorneys' fees, costs, and expenses incurred in this action as permitted under Cal. Pen. Code § 502(e)(2).

e)    That all costs of this action be taxed to Defendants; and

f)    That the Court grant all such other and further relief that the Court deems just and proper.

DATED: December 4, 2025        **ZWEIBACK, FISET & ZALDUENDO, LLP**


*Jeanine Zalduendo*

_____

Jeanine Zalduendo

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all the issues so triable within this Complaint.

3

4     DATED: December 4, 2025                    **ZWEIBACK, FISET & ZALDUENDO, LLP**

5

6

7

8

9                                                                          _____

Jeanine Zalduendo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT